UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WE THE PATRIOTS USA INC., ET AL | : | CIVIL NO. 3:24-CV-01054 (JCH) |
| *Plaintiffs* | | |
| | | |
| v. | : | |
| | | |
| | | |
| JOHN P. DOYLE, JR. | : | AUGUST 15, 2025 |
| *Defendant* | | |

**<u>DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT</u>**

On June 6, 2023, Connecticut signed into law "An Act Addressing Gun Violence," also known as Public Act No. 23-53. This Act included a myriad of common-sense gun restrictions designed to improve public safety, reduce gun violence, and keep guns out of the hands of dangerous people. Provisions of the law—the most ambitious and broad package of gun regulation enacted in the state since Connecticut endured the tragedy of Sandy Hook in 2013—ranged from assault weapon restrictions to unprecedented allocation of funds for community violence intervention and prevention. Plaintiffs challenge two portions of the Act, now codified at Conn. Gen. Stat. §§ 29-33(f) and 29-35(a)(2), that place limits on commercial handgun sales and restrict open carry of firearms in the state.

Plaintiffs' claims fail for several reasons. First, the Court lacks subject matter jurisdiction over all claims except Plaintiff Tischer's challenge to the open carry restriction. Second, Plaintiffs' claim as to Conn. Gen. Stat. § 29-33(f) fails as a matter of law at the first step of the Second Amendment inquiry, because it constitutes a presumptively lawful commercial condition that does not implicate the plain text of the Amendment. Finally, even if the Court had jurisdiction over Plaintiffs' claims challenging both Conn. Gen. Stat. §§ 29-33(f) and 29-35(a)(2), and Plaintiffs

1

could meet their burden to show the restricted conduct is protected by the Second Amendment, their challenges fail as a matter of law at the second step of the Second Amendment analysis. The challenged statutes are well within the Nation's historical tradition of firearm regulation, and entirely constitutional.

For these reasons explained more fully below, the Court should grant Defendant's motion for summary judgment.

## I.    BACKGROUND

### A.    The Open Carry Restriction, Conn. Gen. Stat. § 29-35(a)(2)

In their Complaint, Plaintiffs challenge "sections two and nine of the Act" and seek "[a] permanent injunction enjoining the Defendant and his agents from enforcing any provision of sections two and nine of the Act." Doc. 1 at 8, ¶¶ A and C. Public Act No. 23-53[1] made numerous changes to Conn. Gen. Stat. § 29-35, but Plaintiffs challenge subsection (a)(2), which relates to carrying of firearms. Conn. Gen. Stat. § 29-35(a)(2) provides:

> (2) No person shall knowingly carry any firearm with intent to display such firearm, except when such person is within such person's dwelling house, on land leased, owned or otherwise possessed by such person or within the place of business of such person, or such person is engaged in firearm training or bona fide hunting activity, or such person has been explicitly permitted by another person to carry such firearm with intent to display such firearm while within such other person's dwelling house, on land leased, owned or otherwise possessed by such other person, or within the place of business of such other person. For the purposes of this subdivision, a person shall not be deemed to be carrying a firearm with intent to display such firearm if such person has taken reasonable measures to conceal the fact that such person is carrying a firearm. Neither a fleeting glimpse of a firearm nor an imprint of a firearm through such person's clothing shall constitute a violation of this subdivision. If a person displays a firearm temporarily while engaged in self-defense or other conduct that is otherwise lawful, such display shall not constitute a violation of this subdivision. The provisions of this subdivision shall not apply to any (A) security guard or other person employed to perform the duties of protecting public or private property while in the performance of such duties or traveling to or from such duties,

---

[1] A copy of the Public Act can be found at https://www.cga.ct.gov/2023/ACT/PA/PDF/2023PA-00053-R00HB-06667-PA.PDF. The relevant portions of the Act are codified as Conn. Gen. Stat. § 29-33(f)(1) and Conn. Gen. Stat. §§ 29-35(a)(2).

(B) person carrying a firearm as a necessary part of participation in an honor guard or an historic reenactment, or (C) bail enforcement agent licensed under sections 29-152f to 29-152i, inclusive.

The provision carves out numerous exceptions, including for law enforcement and military members, for individuals moving their residence, for transport to and from competitions, training, firearm repairs, meetings of certain firearm groups, exhibitions of collectors, or transporting antique pistols or revolvers. Conn. Gen. Stat. § 29-35 (3). Law-abiding gun owners may still carry weapons, they just may not do so conspicuously displaying a gun at their hip, inspiring fear in passers-by.

In passing this restriction the Connecticut Legislature intended to address the fear and concern that may be prompted by open carrying. "What this language in the underlying bill attempts to do is to stop someone from parading down a street, openly carrying a firearm in such a manner so as to cause concern..." Judiciary Committee Joint Favorable Report, Public Act No. 23-53. The Connecticut Legislature specifically intended to address "people walking around carrying guns… doing it to intimidate others." *Testimony before the Connecticut Joint Committee on the Judiciary on An Act Addressing Gun Violence,* P.A. No. 23-53 (March 5, 2023) quoting Elsa Peterson Obuchokowski and Jonathan Perloe (Communications Director for CT Against Gun Violence).

### B.    Commercial Sales Limit, Conn. Gen. Stat. § 29-33(f)

Plaintiffs also challenge the monthly commercial sales limit on handguns contained in Conn. Gen. Stat. § 29-33(f), which provides:

(1) *The Commissioner of Emergency Services and Public Protection shall not issue more than three authorization numbers for sale at retail of a pistol or revolver to any transferee within a thirty-day period*, except that if such transferee is certified as a firearms instructor by the state pursuant to section 29-28 or the National Rifle Association, said commissioner shall not issue more than six authorization numbers within a thirty-day period.

3

(2) No authorization number issued for any of the following purposes shall count toward the limits in subdivision (1) of this subsection: (A) Any firearm transferred to a federal, state or municipal law enforcement agency, or any firearm legally transferred under the provisions of section 29-36k, (B) the exchange of a pistol or revolver purchased by an individual from a federally licensed firearm dealer for another pistol or revolver from the same federally licensed firearm dealer not later than thirty days after the original transaction, provided the federally licensed firearm dealer reports the transaction to the Commissioner of Emergency Services and Public Protection, (C) as otherwise provided in subsection (h) or (i) of this section, or (D) a transfer to a museum at a fixed location that is open to the public and displays firearms as part of an educational mission.

Conn. Gen. Stat. § 29-33(f)(1)-(2) (emphasis added). While this provision effectively restricts individuals from purchasing more than three handguns within a thirty-day period at commercial sale, it controls the activities of the Commissioner of Department of Emergency Services and Public Protection ("DESPP"). It does so by prohibiting him or her from issuing more than three authorization numbers for retail sale. Other similar state laws impose far more onerous commercial sales limits, and some directly regulate the conduct of individuals. *See, e.g.,* Cal. Penal Code § 27540(g) (limiting individual purchasers to one gun of any kind a month); Md. Code Ann., Pub. Safety §§ 5-128(a), (b), 5-129, 5-144 (limiting individual purchasers to one handgun or assault weapon per month); N.J. Stat. Ann. §§ 2C:58-2(a)(7), 2C:58-3(i), 2C:58-3.4 (limiting issuance of seller permits for more than one handgun per month); Va. Code Ann. § 308.2:2(R) (limiting handgun purchases to one per month); N.Y. Admin. Code § 10-302.1 (limiting all firearm purchases (not just handguns) to one handgun and one rifle or shotgun every 90 days).

Connecticut's commercial sale limit applies solely to handguns. There are no restrictions on how many authorization numbers may be issued for long guns (including rifles and shotguns), nor is there any limitation on private transactions and transfers not made at retail, nor is there any limitation on retail purchases of ammunition, firearm accessories, or firearm parts. Thus, an individual may obtain as many weapons as desired by private transfer, by private transaction, and

4

by purchase of firearm parts and private assembly.[2] Further, there are exceptions to the commercial sales limit, allowing for up to six authorizations numbers to be issued where the purchaser is a firearms instructor, and if the transaction meets any of the four exceptions contained in subsection (2).

This amendment to § 29-33 was enacted in response to a specific concern: firearms trafficking and straw purchases. Testimony supporting the bill from DESPP explained that straw purchases—bulk firearm purchases then transferred to individuals without the legal ability to purchase the weapons themselves, who may then use the weapons for criminal purposes—was a real problem in Connecticut that the commercial sales limit intended to address.[3] By acquiring guns from another person, straw purchasers can evade the background checks that vendors must perform for each transaction. See § 28220; 18 U.S.C. § 922(t). Thus, the law is designed to curtail the illegal gun market, disarm criminals, and save lives. And studies on the effectiveness of similar laws show that they work: as several of Defendant's experts recognize, commercial sales limits are effective in reducing the number of illegal firearms sourced from states with such restrictions. See Ex. A, Pg. 5; Ex. E, Pgs. 9-10 (noting that studies of commercial purchase limits have found them effective).

### C.  Procedural History

Plaintiffs Brandon Tischer and Matthew Sherman are residents of Connecticut who are licensed under Connecticut law to carry and purchase firearms. While Plaintiff Tischer has open

---

[2] Both individual Plaintiffs have assembled some of the firearms that they own by purchasing the weapon parts. See Ex. F, Pgs. 25-26; Ex. G., Pg. 18.

[3] State of Connecticut Department of Emergency Services & Public Protection, Office of the Commissioner – Judiciary Committee Testimony (March 6, 2023) (noting that "Between 2017 and 2021, nearly 25% of traced crime guns had a time-to-crime period of less than a year, and 46% had a time-to-crime of three years or fewer. Shorter time-to-crime periods are indicators of illegal trafficking and provide crucial intelligence to investigators.")

carried his handguns in the past and intends to do so but for the existence of the open carry restriction, he has never purchased more than three handguns in a month, nor has he ever attempted to, because to do so would be cost-prohibitive. Ex. G, Pg. 23; 35. Plaintiff Sherman has never open carried in Connecticut and has never purchased more than three handguns in a year, nor does he have any intention to do either. Rather, he seeks to "stand[] up" for the rights of those who do. Ex. F, Pgs. 44-45. Plaintiff We The Patriots USA, Inc., ("WTP") identifies itself as a "charity" that is allegedly "dedicated to promoting and defending constitutional rights, including Second Amendment Rights, through education, outreach, and public interest litigation." Doc. #1 at ¶¶ 2, 3, 4.

The Plaintiffs collectively filed suit against State's Attorney Doyle on June 17, 2024, who they allege "has responsibility for prosecuting violations of the State of Connecticut's criminal law." Doc. #1 at ¶ 5. "He is sued in his official capacity only." *Id.* Plaintiffs initially brought claims that the Act violated both the Second Amendment and Article First, Section Fifteen of the Connecticut Constitution. Doc. #1 at ¶¶ 23-30. Defendant moved to dismiss Plaintiffs' state law claims as barred by the Eleventh Amendment under the *Pennhurst* doctrine. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984). Doc. # 16. This Court agreed and granted the motion to dismiss absent objection from the Plaintiffs. See Doc. # 19. Thus, only Plaintiffs' claims pursuant to the Second Amendment to the United States Constitution remain.

Plaintiffs seek injunctive and declaratory relief enjoining the Defendant, State's Attorney Doyle, from enforcing of the provisions of the Act as described above. Doc. #1 at 6, ¶¶ A-E.

## II.    SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any fact and that the party is entitled to judgment as a matter of law." A principal purpose of a summary judgment motion under Rule 56 is to isolate and dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986).

The party seeking summary judgment always has the initial responsibility of informing the court of the basis for its motion by identifying the portions of the pleadings, affidavits or other documentary evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Id.* at 323-24. The moving party may satisfy this burden by demonstrating the absence of evidence supporting the nonmoving party's case. *See Pepsi Co., Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam). The court construes the facts in the light most favorable to the nonmoving party's case. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162, (2d Cir.), *cert. denied*, 127 S. Ct. 382 (2006).

When the moving party meets its burden and demonstrates the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to affirmatively set forth facts showing that there is indeed a genuine issue for trial. Rule 56(e), Fed. R. Civ. P. The nonmoving party cannot, however, oppose a properly made motion by reference only to its own pleadings. *Celotex Corp.*, 477 U.S. at 323-24. To defeat a motion for summary judgment, the non-moving party may not merely rely upon unsupported allegations made in their complaint, nor rely on "mere speculation or conjecture." *Knight v. Fire Insurance Company*, 804 F.2d 9, 12 (2nd Cir. 1986), *cert. denied,* 480 U.S. 932 (1987). The evidence must be presented in a manner consistent with its admissibility at trial. "Under the Local Rules, when ruling on summary judgment, Courts are required to consider only evidence that is admissible." *O'Brien v. Wisniewski*, No. 3:10-CV-120 CSH, 2012 WL 1118076, at *4 (D. Conn. Apr. 3, 2012) (citing *Giannullo v. City of New York,* 322

F.3d 139, 142 (2d Cir.2003)); *see also* D. Conn. L. Civ. R. 56(a)(1) (court may only consider statements of fact that are 'supported by the evidence'). "As Judge Squatrito noted in *Martin v. Town of Westport,* 558 F.Supp.2d 228, 231 (D.Conn.2008), 'the court knows the difference between admissible and non-admissible evidence, and would not base a summary judgment decision simply upon the self-serving *ipse dixit* of a particular party.'" *Id.*

Thus, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. "A nonmoving party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight*, 804 F.2d at 12. Moreover, a party may not create a genuine issue of fact by presenting unsupported statements. *Securities and Exchange Comm'n. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978). At the summary judgment stage, a nonmoving party "must offer some hard evidence showing that its version is not wholly fanciful." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998). "Summary judgment cannot be defeated by the presentation ... of but a 'scintilla of evidence' supporting [a] claim." *Mercado v. Dep't of Corr.*, No. 3:16-CV-1622, 2018 WL 2390139, at *4 (D. Conn. May 25, 2018) (quoting *Anderson,* 477 U.S. at 251).

## III.    ARGUMENT AND APPLICABLE LAW

### A.    This Court lacks jurisdiction over all claims except Plaintiff Tischer's challenge to the open carry restriction.

As a preliminary matter, both the individual Plaintiffs and WTP bear the burden to establish that this Court has subject matter jurisdiction over their claims. They cannot do so. Both Plaintiff Sherman and WTP lack standing entirely, and Plaintiff Tischer lacks standing to challenge the

8

commercial sales limit because he cannot demonstrate an injury in fact. Further, no Plaintiff has standing to challenge the commercial sales limit for the additional reason that no Plaintiff can establish either traceability to Defendant, or that their purported injury is likely to be redressed by the relief they seek. Finally, even if Plaintiffs could somehow establish standing, their claim challenging the commercial sales limit is barred by the Eleventh Amendment.

>    1.    **Plaintiff Sherman lacks standing on all claims, because he only seeks to vindicate the rights of others through this suit and can establish no actual or imminent injury.**

"To establish Article III standing, a plaintiff must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Silva v. Farrish*, 47 F.4th 78, 86 (2d Cir. 2022) (*quoting Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Constitutional standing doctrine is designed "to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Id.* More precisely, it "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Establishing standing is an "indispensable part of the plaintiff's case", and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Carter v. HealthPort Techs., LLC,* 822 F.3d 47, 56 (2d Cir. 2016) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)).

In the context of facial pre-enforcement challenges, like those asserted here, a plaintiff has standing "when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative.'" *Hedges v. Obama,* 724 F.3d 170, 196 (2d Cir. 2013). Courts apply a three-prong test to assess the existence of a cognizable injury in fact in the context of pre-enforcement challenges, which requires a plaintiff to demonstrate: (1) "an intention to engage in a

9

course of conduct arguably affected with a constitutional interest"; (2) that the intended conduct is "proscribed by" the challenged law; and (3) that "there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 159 (2014)) (internal quotation marks and citation omitted). An "allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Urso v. Mohammad,* No. 3:20cv0674 (JBA), 2023 U.S. Dist. LEXIS 40472, at *27 (D. Conn. Mar. 10, 2023). "A plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has an actual and well-founded fear that the law will be enforced against it." *Vermont Right to Life Committee, Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000). However, the claim of a "*possible* future injury is not sufficient to confer standing," *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added).

At a minimum, to satisfy the "injury in fact" element, a plaintiff must have suffered "an invasion of a legally protected interest" that is "concrete and particularized," meaning "that the injury *must affect the plaintiff in a personal and individual way*." *Lujan,* 504 U.S. at 560, 560 n.1 (emphasis added). It is well-established that plaintiffs may not sue solely to vindicate the rights of others. *See, e.g., Puglisi v. Underhill Park Taxpayer Association*, 947 F. Supp. 673, 683 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 844 (2d Cir. 1997) ("plaintiffs may only sue for deprivation of their own constitutionally and federally protected rights and not the rights of others"); *Singleton v. Wulff*, 428 U.S. 106, 114 (1976) ("one may not claim standing . . . to vindicate the constitutional rights of some third party").

Plaintiff Sherman testified that he had no intentions to either openly carry any firearms or commercially purchase more than three handguns in a thirty-day period. As to the former, Mr.

Sherman noted that prior to the imposition of the open carry restrictions, he had never carried his firearms openly in Connecticut, and that he "never had any plans to carry [his] weapons openly" even after passage of the law. Ex. F, Pg. 35 ("before this, legally Connecticut was an open carry state though no one did it…"); Pg 35-36 ("Q: …so even prior to the passage of the law, you've never actually open carried… A: No, sir."); Pg. 40. Similarly, Mr. Sherman noted that he had never commercially purchased more than three handguns in a month, and even without the existence of §29-33(f), he would not, because he could not afford to. *Id.*, Pg. 42 ("I can't afford three handguns in a month"). Rather, Mr. Sherman stated that though he had no intentions to either openly carry his weapons or commercially purchase more than three handguns in a month, he felt he "ha[d] to stand up for those who do." *Id.,* Pg. 44-45 ("I'm just standing up for the rights of those who do open carry or want to buy more than three guns in a month."). Mr. Sherman's admissions cannot even be described as "some day intentions," which themselves are insufficient to confer standing. *See Gazzola v. Hochul*, 88 F.4th 186, 203 n.9 (2d Cir. 2023) ("some day intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the actual or imminent injury that our cases require.") (quotations omitted).

Mr. Sherman's desire to stand up for the rights of others is insufficient to establish standing. "The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet [standing] requirements." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (quoting *Diamond v. Charles*, 476 U.S. 54, 62 (1986)); *see also Kearns v. Cuomo,* 981 F.3d 200, 207 (2d Cir. 2020). Because "[t]he exercise of judicial power . . . can so profoundly affect the lives, liberty, and property of those to whom it extends. . . the decision to seek review must be placed in the hands of those who have a direct stake in the outcome." *Diamond v. Charles*, 476 U.S. 54, 62,

(1986) (internal quotation marks omitted). Mr. Sherman here has not established any injury in fact, and consequently, this Court lacks jurisdiction and must dismiss his claims.

> **2.    Plaintiff Tischer lacks standing to challenge Conn. Gen. Stat. § 29-33(f), because his vague, "someday" plans to purchase more than three handguns in a month—despite his utter lack of economic ability to do so—are insufficient to establish the actual or imminent injury required.**

Plaintiff Tischer cannot establish standing to challenge the commercial sales limit because he has no concrete plans to engage in conduct effectively proscribed by the law. While a plaintiff does not have to be actually arrested or prosecuted to be entitled to challenge a statute that he claims "deters the exercise of his constitutional rights," they must still prove "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 386 (S.D.N.Y. 2023).

Even if Mr. Tischer could demonstrate Defendant will or could prosecute him for violating a statue that does not proscribe his conduct, he has still not met this burden. In his Complaint, Mr. Tischer does not even allege that he has any desire or intention to attempt to purchase more than three handguns in a month. See Doc. # 1. And Mr. Tischer concedes that he has never commercially purchased more than three handguns in a month; indeed, he has never purchased more than *one* firearm, of any kind, in a thirty day period. Ex. G, Pg. 23; 35. When asked why he had not done so, Mr. Tischer truthfully answered that "it gets pretty expensive" to purchase multiple firearms, indicating he was unable to afford to purchase more than three firearms in a month in the past. *Id.,* Pg. 35. While Tischer stated that, if not for the existence of § 29-33(f), he would purchase more than three handguns in a month, he was unable to answer which handguns he would purchase. *Id.,* Pgs. 35-36. Plaintiff's vague and equivocal "intention" to purchase more than three handguns in a month is insufficient to meet standing requirements. *See Brooklyn Branch*

*of NAACP v. Kosinski*, 657 F. Supp. 3d 504, 517 (S.D.N.Y. 2023) ("[i]t is not enough for plaintiffs to plead a vague intention to expose themselves to harm at an indeterminate time[,]" even in the pre-enforcement context).

Further, Mr. Tischer indicated that he would only purchase more than three handguns in a month "*if* [he] had… the funds to do it." *Ex. G,* Pg. 36 (emphasis added). Prior to the passage of § 29-33(f), Mr. Tischer had never purchased more than *one* handgun in a 30-day period, let alone four, because "it gets pretty expensive" to do so. *Id.,* pg. 35. And, in his current circumstances, Mr. Tischer's annual salary from his small business is approximately two thousand dollars per year, and he has no other source of disposable income.[4] The cheapest handgun Mr. Tischer had ever purchased was approximately $400. Ex. G, Pg. 44. It defies belief that Mr. Tischer could reasonably expend nearly his *entire annual salary* on handguns, in a 30-day period, when he has never done so before, and when he would be left with no funds to pay for his monthly necessities, let alone any other expenses. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper*, 568 U.S. at 409. Mr. Tischer has not and cannot show that he even can feasibly purchase more than three handguns in a month, let alone that he has "concrete plans" to do so. *See Carney v. Adams,* 141 S. Ct. 493, 501-02 (2020) (finding that because plaintiff had not shown that he was "able and ready" to apply for a judicial vacancy in the imminent future, he had failed to establish standing to challenge a state law restricting judgeship eligibility).

Ultimately, the commercial sales limitation of 29-33(f) simply does not affect Mr. Tischer in any personal or concrete way.  His supposed "intentions" to purchase more than three handguns

---

[4] Though Mr. Tischer indicated he occasionally received funds for the support of several dependents, that money was typically for their care—not for purchasing handguns. Ex. G, Pgs. 45-47.

in a month are far too conjectural and contradict the way Plaintiff acted prior to passage of this law, when he could have purchased however many handguns he wanted over any time period. Whether the statute existed or not, Mr. Tischer has no plans to purchase more than three handguns in a month. Thus, even if Plaintiff could be prosecuted under this law, he still cannot establish he has standing to challenge it. Consequently, this Court must dismiss his claim.

> **3.    Plaintiff WTP cannot establish either organizational or associational standing, and all its claims must be dismissed.**

"Under current standing jurisprudence, an organization may assert two distinct types of standing: (1) organizational standing, and (2) associational standing." *Rodriguez v. Winski*, 444 F. Supp. 3d 488, 492 (S.D.N.Y. 2020) (citing *Warth v. Seldin,* 422 U.S. 490, 511 (1975)). "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

However, the Second Circuit has repeatedly reaffirmed its rule that an organization lacks standing to sue under 42 U.S.C. § 1983 for violations of the rights of its members. "It is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983[.]" *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011); *Hunter v. Cortland Hous. Auth*., No. 5:23-CV-1540 (GTS/ML), 2024 U.S. Dist. LEXIS 84218, at *15 (N.D.N.Y. May 9, 2024 (collecting cases). "Neither [the] language nor the history . . . [of § 1983] suggests that an organization may sue under the Civil Rights Act for the violations of rights of members." *League of Women*, 737 F.2d at 160 (quoting *Aguayo v. Richardson*, 473 F.2d 1090 (2d

Cir.1974), *cert. denied*, 414 U.S. 1146 (1974)). WTP's claims here are purportedly brought pursuant to 42 U.S.C. § 1983, and therefore WTP does not have associational standing.

Further, even if it were not the law that WTP may not assert associational standing when suing pursuant to § 1983, under *Hunt*, WTP must establish that its individual members would have standing. *See also Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (noting the "*requirement* of naming the affected members" of an organization/association "cannot be dispensed with in light of statistical probabilities") (emphasis added). Even assuming *arguendo* that either Plaintiff Tischer or Sherman have standing to bring their claims, neither is a member of WTP. See Ex. F, Pgs. 16-17; Ex. G, Pg. 14. Accordingly, WTP cannot establish associational standing on their behalf.

WTP fares no better under a theory of organizational standing. To demonstrate organizational standing, a plaintiff must show: "(i) an imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable; (ii) that its injury is fairly traceable to [the act]; and (iii) that a favorable decision would redress its injuries." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (internal quotation marks omitted). An organization has suffered an injury in fact when it can show a "perceptible impairment" to its core activities, resulting in "some perceptible opportunity cost" as a result of the alleged violation. *Nnebe*, 644 F.3d at 157; *see also N.Y. State Citizens' Coal. for Child. v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019). An organization may suffer the requisite injury when it is "forced to devote significant resources" to counteract a defendant's actions. *Ragin v. Harry Macklowe Real Est. Co.,* 6 F.3d 898, 905 (2d Cir. 1993) (internal quotation marks omitted). Important to the analysis is "the involuntary and material impacts on core activities by which the

organizational mission has historically been carried out." *Connecticut Parents Union v. Russell-Tucker,* 8 F.4th 167, 173 (2d Cir. 2021) (emphasis in original).

"Moreover, an organization lacks standing to sue in its own right as a result of injuries that are not fairly traceable to the defendant." *Nat'l Rifle Assoc. of Am. v. Cuomo*, 480 F. Supp.3d 404, 411 (N.D.N.Y. 2020) (quoting *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 541 (S.D.N.Y. 2006) (citing *Bennett v. Spear*, 520 U.S. 154, 162 (1997))). "Abstract injury is not enough; rather, the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Id.* (internal quotation marks omitted); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983). An organization "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that [it] . . . will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).

The entirety of WTP's allegations in the Complaint are contained in paragraph 2:

WE THE PATRIOTS USA, INC. is a nonprofit public charity organized and operated exclusively for tax-exempt purposes in accordance with Section 501(c)(3) of the Internal Revenue Code. More specifically, it is dedicated to promoting and defending constitutional rights, including Second Amendments Rights, through education, outreach and public interest litigation. As a Section 501(c)(3) public charity, it has members who participate in its tax exempt activities as volunteers and committed community stakeholders bringing and supporting litigation in federal and state courts on a variety of constitutional and other freedom-related matters directly affecting their rights and interests. Its members include Connecticut residents affected by the matters complained of herein and share common claims to that brought by WE THE PATRIOTS USA, INC., its registered as a Connecticut corporation.

WTP has not and cannot show any "perceptible impairment" to its core activities. Here, WTP does not allege what, if any, core activities it has been forced to forgo or even curtail because of the challenged statutes. It fails to allege any impact on itself whatsoever in the Complaint. The best it can point to is filing "public interest litigation" which would presumably cost the organization money. This theory of standing has been squarely rejected by the Supreme Court.

16

In *FDA v. All. for Hippocratic Med,* plaintiff medical associations brought a challenge to FDA actions regarding mifepristone, claiming the FDA "forced the associations to expend considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education . . . to the detriment of other spending priorities." 602 U.S. 367, 394 (2024). The Court rejected this theory. "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way." *Id*. at 394. Likewise here, WTP cannot simply claim an injury because they decided to spend money suing Defendant. Even if this could satisfy the injury in fact requirement, it fails because WTP's alleged injury is not "fairly traceable to [the challenged statutes]." *Conn. Parents Union v. Wentzell,* 462 F. Supp. 3d 167, 173 (D. Conn. 2020), *aff'd*, 8 F.4th 167 (2d Cir. 2021). Here, even reading WTP's alleged injury charitably—diversion of resources to cover the cost of this lawsuit—this stems not from the challenged statutes, but its own decision to sue.

The court ruled on this prong of the test in *Conn. Parents Union*, holding that though the plaintiff made allegations of "expenditure of resources," the "complaint pleads no facts showing how the Act compelled CTPU to forgo those activities. . . ."[5] *Conn. Parents,* 462 F. Supp. 3d at 172. The court held that the causation requirement was not satisfied. *Id*. at 173. Specifically, the

---

[5] The Second Circuit ultimately did not address the causation or "traceability" issue because both parties agreed "that our standing inquiry here turns principally on the first element: injury-in-fact." *Conn. Parents Union*, 8 F.4th at 173 n.19. The Court stated "[t]he connection between injury and causation is particularly close where, as here, the plaintiff is not the object of the challenged legislation and is therefore not under any direct physical or legal compulsion that would require it to incur costs constituting an injury. But here, because we conclude that CTPU fails to demonstrate injury-in-fact, consideration of the injury prong is sufficient to resolve the dispute before us." *Id*.

court held that "[c]ausation is not met when a plaintiff's injury arises from 'the independent action of some third party.'" *Id*. (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)).

The court recognized the "relatively modest" burden to show causation, but found "that burden is harder to meet where, 'traceability depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict.'" *Id*.  (quoting *New York v. United States Dep't of Commerce*, 315 F. Supp. 3d 766, 785 (S.D.N.Y. 2018)); *see also Lujan*, 504 U.S. at 562 ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.").  There, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation." *Lujan*, 504 U.S. at 562; *see also Bennett v. Spear*, 520 U.S. 154, 169 (1997) (concluding that a party may meet the standing requirement if it suffered an "injury produced by determinative or coercive effect upon the action of someone else").  "CTPU is not the object of the Act, and the complaint does not allege that parents whose children were impacted by the Act were forced to seek assistance from CTPU. Nor does the complaint proffer any facts showing that the parents' calls 'coerc[ed]' or otherwise compelled CTPU to expend resources to oppose the Act. CTPU was free to decline the parents' requests at no cost to the organization; that it opted to do otherwise does not grant it standing." *Conn. Parents Union*, 462 F. Supp. 3d at 174 (quoting *Bennett*, 520 U.S. at 169). Here, WTP suffers from the same deficiency.  It lacks standing and all claims made by WTP must be dismissed.

### 4.    No Plaintiff has standing to challenge Conn. Gen. Stat. § 29-33(f).

In addition to the reasons articulated above, all Plaintiffs also lack standing to challenge Conn. Gen. Stat. § 29-33 (f). They cannot establish any of the three requirements to prove Article

III standing in relation to the commercial sales limit, as they cannot demonstrate an injury in fact, they cannot demonstrate traceability, and they cannot demonstrate that the relief they seek will redress their supposed harm.

> a.  **Plaintiffs cannot establish an injury in fact because the statute does not proscribe the conduct of anyone besides the Commissioner of DESPP, so no Plaintiff can demonstrate a credible threat of prosecution under the statute.**

None of the Plaintiffs can establish an injury in the context of their pre-enforcement challenge to the commercial sales limit. As discussed above, "[a]n injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not 'conjectural' or 'hypothetical'" and must be personalized to the plaintiff asserting the claim. *Vitagliano v. Cty. of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (quoting *Lujan*, 504 U.S. at 560). In other words, a plaintiff has standing to make a pre-enforcement challenge when *their* fear of criminal prosecution under an allegedly unconstitutional statute "is not imaginary or wholly speculative.'" *Id.* at 136-37 (quoting *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (quotation omitted)); *see also Frey v. Nigrelli*, 661 F. Supp. 3d 176, 189 (S.D.N.Y. 2023).

Here, Plaintiffs fear of prosecution is entirely imaginary and wholly speculative, because they cannot be prosecuted under § 29-33 (f). As noted above, Conn. Gen. Stat. § 29-33(f)provides:

> (1) *The Commissioner of Emergency Services and Public Protection shall not issue more than three authorization numbers for sale at retail of a pistol or revolver to any transferee within a thirty-day period*, except that if such transferee is certified as a firearms instructor by the state pursuant to section 29-28 or the National Rifle Association, said commissioner shall not issue more than six authorization numbers within a thirty-day period.

Conn. Gen. Stat. § 29-33(f)(1)-(2) (emphasis added). And the criminal enforcement provision contained in paragraph j of § 29-33 states:

> Any person who violates any provision of this section shall be guilty of a class C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, except that any person who sells, delivers or otherwise transfers a pistol or revolver in violation of the provisions of this section knowing that such pistol or revolver is stolen or that the manufacturer's number or other mark of identification on such pistol or revolver has been altered, removed or obliterated, shall be guilty of a class B felony for which three years of the sentence imposed may not be suspended or reduced by the court, and ten thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, and any pistol or revolver found in the possession of any person in violation of any provision of this section shall be forfeited.

Conn. Gen. Stat. § 29-33(j).

Setting aside whether either Mr. Sherman or Mr. Tischer have a concrete intention to purchase more than three pistols or revolvers within a thirty-day period, such conduct is not "proscribed by the challenged law." *Susan B. Anthony List*, 573 U.S. at 159. Rather, this portion of the statute proscribes the conduct of *the Commissioner of DESPP*, preventing him from issuing three or more authorization numbers for sale at retail of a pistol or revolver to any transferee within a thirty-day period. It does not apply to Mr. Tischer, Mr. Sherman, or WTP at all. Further, none of the Plaintiffs could be prosecuted for violating this portion of the statute because they *cannot* violate that portion of the statute. Therefore, all Plaintiffs lack standing to bring this challenge to the extent it is a pre-enforcement challenge, and this Court lacks subject matter jurisdiction over the claim.

> **b.    Plaintiffs cannot demonstrate traceability because Defendant has no authority or ability to prosecute them for violation of Conn. Gen. Stat. § 29-33(f).**

Further, Plaintiffs' claim as to the commercial sales limit fails the traceability portion of the standing analysis. "The traceability requirement of Article III standing means that the plaintiff must demonstrate a causal nexus between the defendant's conduct and the injury." *Wade v.*

*Rodriguez*, No. 24-2495-cv, 2025 U.S. App. LEXIS 12040, at *4 (2d Cir. May 19, 2025) (quoting *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016)). "'[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision'" against the plaintiffs. *Greater Chautauqua Fed. Credit Union v. Marks*, 600 F. Supp. 3d 405, 423 (S.D.N.Y. 2022) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007)).

State's Attorney Doyle cannot prosecute Plaintiffs for a violation of Conn. Gen. Stat. § 29-33(f) because the statute does not proscribe their conduct. There is simply no causal nexus between State's Attorney Doyle and Plaintiffs' conduct. Even if Plaintiffs were to claim their injury in fact is their inability to purchase more than three handguns in thirty days—a contention problematic for them for various other reasons addressed *infra*—the person preventing them from doing so is not Defendant, but rather the Commissioner. *See Gazzola*, 88 F.4th at 202-03 (finding no standing for Second Amendment claim despite alleging a desire to purchase "additional semi-automatic rifles" because plaintiff failed "to show how the non-defendant county's failure to provide license applications is fairly traceable to the challenged action of the named defendants . . ."). Either way, Plaintiffs have no standing to challenge § 29-33(f).

        **c.    Plaintiffs cannot establish redressability because the requested injunction would have no effect on their ability to purchase more than three handguns in a thirty-day period.**

Plaintiffs' claim also fails because the relief they seek would not remedy their alleged harm, even if granted. "Redressability is the non-speculative likelihood that the injury can be remedied by the requested relief." *Coal. of Watershed Towns v. United States EPA*, 552 F.3d 216, 218 (2d Cir. 2008) (quotation omitted). "[I]t must be likely, as opposed to merely speculative, that the

injury will be redressed by a favorable decision." *Id.* (quoting *Lujan*, 504 U.S. at 561 (internal quotations omitted)). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Id.* (quoting *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107 (1998)). "[T]hat is the very essence of the redressability requirement." *Steel Co.*, 523 U.S. at 107.

The relief Plaintiffs seek—enjoining Defendant from "enforcing any provision of section[6][] . . . nine of the Act"—will not offer the outcome they desire, as it will not impact their ability to commercially purchase more than three handguns in a thirty-day period. Indeed, even if States' Attorney Doyle were precluded from "enforcing" this section, the Commissioner of DESPP is still prohibited from issuing more than three authorization numbers in a thirty-day period. Even if Plaintiffs had adequately pled an injury in fact, they cannot demonstrate that such injury would be redressed by an order enjoining this Defendant. Put simply, State's Attorney Doyle is not the state official preventing Plaintiffs from purchasing more than three handguns in a month. Plaintiffs cannot establish redressability, lack standing, and this Court lacks jurisdiction, for this reason alone.

> **5.      This Court lacks jurisdiction over all claims challenging Conn. Gen. Stat. § 29-33(f), because they are barred by the Eleventh Amendment.**

Finally, even if this Court could somehow find that Plaintiffs were able to establish standing despite the many deficiancies already identified, their claim challenging the commercial sales limit still fails because it is barred by the Eleventh Amendment. "The Eleventh Amendment bars suits against states and their officials unless the state consents to suit, Congress abrogates the state's immunity, or the case falls within the *Ex parte Young* exception." *NAACP v. Merrill*, 939

---

[6] As previously mentioned, Section Nine of Public Act No. 23-53 amends other provisions of Conn. Gen. Stat. § 29-33. However, Plaintiffs make no allegation regarding the unconstitutionality of any other provision of that statute, nor could they demonstrate that any other portion of that statute runs afoul of the Second Amendment.

F.3d 470, 475 (2d Cir. 2019). The *Ex parte Young* exception "operates to end ongoing violations of federal law and vindicate the overriding federal interest in assuring the supremacy of the law . . . . A plaintiff may invoke this exception provided that his complaint (a) alleges an ongoing violation of federal law and (b) seeks relief properly characterized as prospective." *Id.* (citations and internal quotation marks omitted). Plaintiffs seek only declaratory and injunctive relief and Defendant is sued in his official capacity only. See Doc. # 1. Plaintiffs must therefore invoke the *Ex parte Young* exception to overcome the Eleventh Amendment. *See Ex parte Young*, 209 U.S. at 123. They cannot do so.

"The Supreme Court has instructed that in suits such as this one, which the plaintiff intends as a 'first strike' to prevent a State from initiating a suit of its own, the prospect of state suit must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury. *Ex parte Young* thus speaks of enjoining state officers 'who threaten and are about to commence proceedings,'" against the plaintiffs. *HealthNow N.Y., Inc. v. New York*, 739 F. Supp. 2d 286, 294-96 (W.D.N.Y. 2010) (*citing Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 382 (1992)). "The *Ex parte Young* exception only applies against officials who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act." *Chrysafis v. James*, 534 F. Supp. 3d 272, 293 (E.D.N.Y. 2021) (quoting *281 Care Comm. v. Arneson*, 766 F.3d 774, 797 (8th Cir. 2014) (quoting *Ex parte Young*, 209 U.S. 123, 156 (1908))); *see also Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001). When those threats to enforce and bring proceedings *against the plaintiff* are not present, it cannot be said that the official is "involved in an ongoing violation of federal law." *Goodspeed Airport, LLC v. East Haddam Inland Wetlands & Watercourses Comm'n*, 632 F. Supp. 2d 185, 188 (D. Conn. 2009).

The Plaintiffs' failure to establish these prongs of the *Ex Parte Young* exception is "fatal" to their claim. *HealthNow N.Y., Inc. v. New York*, 739 F. Supp. 2d 286, 295 (W.D.N.Y. 2010).

Plaintiffs cannot meet their burden to demonstrate Doyle is "about to commence proceedings, either of a civil or criminal nature, to enforce against parties." *Chrysafis*, 534 F. Supp. 3d at 293. By its plain language, the challenged provision applies to the Commissioner of DESPP. Defendant cannot commence proceedings against any of these Plaintiffs for violation of this statute because this statute does not criminalize their conduct. Plaintiffs' challenge to this statute fails to satisfy the *Ex parte Young* exception, meaning the Eleventh Amendment bars this claim, depriving this Court of subject matter jurisdiction on this basis alone.

**B.    Even if Plaintiffs could establish this Court has jurisdiction, their claims fail on the merits because they cannot show that Conn. Gen. Stat. § 29-33(f) is presumptively unlawful, and because both challenged statutes are entirely consistent with historical tradition.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. "But that right, the Court twice cautioned, is 'not unlimited,' just as no other right in the Bill of Rights is unlimited.…" *Antonyuk v. James*, 120 F.4th 941, 961 (2d Cir. 2024) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008)). The Second Amendment's right to armed self-defense is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *Heller*, 554 U.S. at 626); *see also United States v. Rahimi*, 602 U.S. 680, 684 (2024).

*Bruen* set out a "test rooted in the Second Amendment's text, as informed by history." 597 U.S. at 19. After *Bruen*, at step one of the test a Court must now consider whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. Plaintiffs bear the burden on

this step of the analysis. If plaintiffs meet that burden, "the Constitution presumptively protects that conduct." *Id.*  If the plaintiff does meet their burden at step one, the burden then shifts to the government to justify its regulation by demonstrating that it is "consistent with *the principles* that underpin our" Nation's historical tradition of firearm regulation. *Rahimi*, 144 S. Ct. at 1898 (emphasis added). If the government does so, then the plaintiffs' claims necessarily fail as a matter of law.

> 1.    **Plaintiffs cannot show the text of the Second Amendment covers the conduct proscribed by Conn. Gen. Stat. § 29-33(f).**

Plaintiffs cannot meet their initial burden to show the monthly commercial sale limit is presumptively unlawful under the Second Amendment because the plain text is not implicated and because regulations on "commercial sale" of firearms are presumptively lawful under *Heller* and its progeny.

At step one, the Court must ask (1) "whether the challenger is 'part of the people' whom the Second Amendment protects,'" (2) whether the item at issue is an "arm" that is "'in common use' today for self-defense," and (3) "whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*, 597 U.S. at 31-32). Further, the Supreme Court in *Heller* identified several categories of regulations that are "presumptively lawful." 554 U.S. at 627 n.26. Regulations on the "commercial sale of arms" like Conn. Gen. Stat. § 29-33(f) is one such category, and therefore the statute is presumptively lawful. *Id.*

> a.    **Conn. Gen. Stat. § 29-33(f) is a "presumptively lawful condition on the commercial sale of arms" as identified in *Heller*.**

Plaintiffs' challenge fails because the commercial sale limit merely imposes a "condition[] and qualification[] on the commercial sale of arms," which makes the law among those

"presumptively lawful regulatory measures" that governments may adopt consistent with the Second Amendment. *Heller,* 554 U.S. at 626-627, 627 n.26; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting this part of *Heller* stating that "nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms. [Footnote 26: We identify these presumptively lawful regulatory measures only as examples]").

In *Heller*, the Supreme Court identified several types of firearm regulations as "presumptively lawful." 554 U.S. at 627 n.26. These include:

(1) "prohibitions on carrying concealed weapons," *id.* at 626,

(2) "prohibitions on the possession of firearms by felons and the mentally ill," *id.,*

(3) "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," *id.,*

(4) "laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626-27, and

(5) "'shall-issue' licensing regimes, under which 'a general desire for self-defense is sufficient to obtain'" a concealed carry permit, *Bruen,* 597 U.S. at 38 n.9 (*quoting Drake v. Filko*, 724 F.3d 426, 442 (3d Cir. 2013) (Hardiman, J., dissenting)).

This safe harbor list,[7] however, is not exhaustive. *Heller,* 554 U.S. at 627 n.26.

A commercial regulation is considered a "condition on commercial sales" if it does not operate as a functional prohibition or total ban on buying a gun. *See id.* Indeed, presumptively lawful restrictions on commercial sales generally "go to where and when such [] sales can take place" as opposed to "what can be sold." *Pena*, 898 F.3d at 1009 (Bybee, J., concurring in part and dissenting in part). The Court in *Bruen* also emphasized that "self-defense is the central component

---

[7] The term "safe harbor" has been used by academics to describe the list of laws and regulations that are presumptively lawful under the Second Amendment. *See, e.g.,* Brannon P. Denning & Glenn H. Reynolds, *Trouble's Bruen: The Lower Courts Respond,* 108 Minn. L. Rev. 3187, 3191 (2024).

of the [Second Amendment] right itself." 142 S. Ct. at 2135 (citations omitted). And the imposition of commercial sales conditions, such as waiting for completion of a background check or licensing requirements, are presumptively lawful because they do not ultimately impact an individual's ability to defend themselves, unlike those that operate as severe restrictions on an individual's ability to keep or bear weapons in self-defense.

For example, the "proper cause" requirement challenged in *Bruen* made it "virtually impossible for most New Yorkers" "to carry a gun outside the home for self-defense," 142 S. Ct. at 2156 (Alito, J., concurring), and therefore effectively "nullif[ied] half of the Second Amendment's operative protections"—i.e., the right to "bear" arms, *id.* at 2135. Though the "commercial restrictions" language has not been deeply developed, "[t]he most reasonable interpretation of that passage [carving out 'presumptively lawful regulatory measures'] is that commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the *Bruen* test." *See B&L Prods., Inc. v. Newsom,* 104 F.4th 108, 119 (9th Cir. 2024). Other Circuits have agreed. *See Rocky Mt. Gun Owners v. Polis,* 121 F.4th 96, 120 (10th Cir. 2024). As the Fourth Circuit noted, "a law's substance, not its form, determines whether it qualifies as a condition on commercial sales." *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives,* 5 F.4th 407, 416 (4th Cir. 2021) (citation omitted), *vacated on other grounds*, 14 F.4th 322 (4th Cir. 2021). A commercial regulation is therefore considered a "condition on commercial sales" if it does not operate as a "functional prohibition" or total ban on acquiring or possessing a gun. *See id.* at 417; *see also Gazzola,* 88 F.4th at 195-196 (determining that the challenged commercial laws were presumptively lawful conditions because they were not "so restrictive that [they] threaten[] a citizen's right to acquire firearms"); *United States v. James*, 677

F. Supp. 3d 329, 343 (D.V.I. 2023) (statute is a commercial regulation when it targets transfer of a firearm).

Here, Connecticut's commercial sales limit is not a total ban on acquiring a firearm, a ban on any particular type of firearm, or even a ban on purchasing firearms. Instead, it regulates when DESPP may issue authorization numbers for commercial sales of certain handguns within a 30-day period. And this purchase limit does not apply to private party transactions, nor does it place any conditions on the purchase of long guns or gun parts or kits. Notably, no Plaintiff has ever even attempted to commercially purchase more than three handguns in a thirty-day period and none has even suggested this law has prevented them from exercising their right of armed self-defense. Indeed, both Plaintiffs own firearms and have done so both before and after the enactment of this commercial sale limitation. It strains credulity to suggest that this law "threatens a citizen's right to acquire firearms" when both Plaintiffs here acknowledge they own multiple firearms and were never prevented from purchasing firearms because of this law. Thus, far from a total ban, Connecticut's purchase limit merely places a "presumptively lawful" condition on the commercial sale of firearms.

        **b.**      **Plaintiffs cannot rebut the presumption of legality of 29-33(f), which imposes conditions on the commercial sale of firearms because they cannot point to anything in the plain text of the Second Amendment that addresses commerce.**

Plaintiffs cannot overcome this presumption of lawfulness because they cannot show that each of the "textual elements" of the Second Amendment's operative clause—which provides a right of the "People" to "keep" and "bear" "Arms," U.S. Const. amend. II—covers the conduct regulated by the commercial sale limit. *Bruen,* 142 S. Ct. at 2134 (citation omitted). The right to "keep arms" refers to possessing arms, and the right to "bear arms" refers to carrying arms "for a particular purpose—confrontation." *Heller*, 554 U.S. at 583-584.

"The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution . . . ." *Rahimi,* 144 S. Ct. at 1910-11 (Kavanaugh, J., concurring). The plain terms "sale," "acquire," or "purchase" are not included in the definitions of "keep" or "bear." *See B&L Prods., Inc.,* 104 F.4th at 117  (noting that "[o]n its face, ['keep and bear'] says nothing about commerce"); *McRorey v. Garland,* 99 F.4th 831, 838 (5th Cir. 2024) (noting that "on its face, 'keep and bear' does not include purchase").

 In contrast to the laws challenged in *Heller*, *McDonald*, and *Bruen*, which effectively operated as restraints on the ability of most law-abiding citizens to "keep" firearms for self-defense or to "bear" "arms" outside the home, Connecticut's commercial sale limit places no restrictions on the number of firearms that the individual Plaintiffs can "keep" nor does it place any limit on their ability to "bear" arms. *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) (a $19 fee on firearms transfers does not "ha[ve] any impact on the plaintiffs' actual ability to obtain and possess a firearm"); *see also Jones v. Bonta*, 34 F.4th 704, 718 (9th Cir. 2022) (requiring that young adults ages 18-20 secure a hunting license before they can acquire some firearms from dealers "does not impose a significant burden on the Second Amendment right to keep and bear arms"), *vacated and remanded on rehearing by* 47 F.4th 1124 (9th Cir. 2022) (mem.) (vacating district court decision for further proceedings consistent with *Bruen*). Indeed, Connecticut's commercial sale limit does not even place a limit on how many firearms may be *acquired* by the individual Plaintiffs. Plaintiffs may engage in as many private transfers as they would like; only commercial sales of more than three revolvers or pistols are impacted by the law. Further, the law does not place any limit on purchases of other firearms—including shotguns, rifles, any other long guns, or gun part kits, allowing for personal assembly of firearms as both Plaintiffs testify they have done—leaving open a wide variety of weapons for purchase if someone has both the financial ability and desire to

purchase more than three firearms in a thirty-day period, and very minimally, if at all, burdening anyone's ability to defend themselves.[8]

Several other courts have agreed that the plain text of the Second Amendment does not include the term "purchase" and therefore similar conduct is not presumptively protected. *See, e.g., B&L Products, Inc.,* 104 F.4th at 117 (holding that the right to keep and bear "says nothing about commerce" and finding the sale and purchase of firearms and ammunition on state property was not covered by plain text).[9]

Ultimately, Plaintiffs bear the burden to both rebut Section 29-33(f)'s presumption of lawfulness and of demonstrating that the restricted conduct—purchasing more than three revolvers or pistols at commercial sale in a thirty-day period—is presumptively protected by the plain text of the Second Amendment. They cannot do so. Their challenge therefore fails.

   **2.     Both Conn. Gen. Stat. §§ 29-33(f) and 29-35(a)(2) are consistent with the nation's history of firearm regulations.**

---

[8] Indeed, both individual Plaintiffs already own nearly ten firearms, suggesting it highly unlikely that either individual has any need to purchase another four firearms per month at commercial sale, which would amount to up to forty-eight firearms per year or has suffered any impairment to their ability to defend themselves. Ex. F, Pg. 24 (Sherman owns nine firearms); Ex. G, Pg. 17 (Tischer owns "about ten to twelve" firearms).

[9] *McRorey,* 99 F.4th at 838 ("keep and bear does not include purchase—let alone without a background check"); *Vermont Federation of Sportsmen's Clubs v. Birmingham,* 741 F. Supp. 3d 172, 2024 WL 3466482, at *22 (D. Vt. 2024) ("[T]he 'right of the people to keep and bear Arms,' . . . does not facially include a right to immediately obtain a firearm through a commercial sale."); *Ortega v. Lujan Grisham,* F. Supp. 3d, 2024 WL 3495314, at *26 (D.N.M. July 22, 2024) ("Having considered the normal and ordinary meaning of the Second Amendment's language, the Court agrees . . . that the Second Amendment's plain text does not cover purchasing firearms." (internal quotation marks omitted)); *Teixeira v. Cty. of Alameda,* 873 F.3d 670, 687 (9th Cir. 2017) (plain text does not include a right to sell firearms); *Rocky Mountain Gun Owners v. Polis,* 701 F. Supp. 3d 1121, 1132 (D. Colo. 2023) ("[T]he receipt of a paid-for firearm without delay is not covered." (cleaned up)). *Cf., Reese v. Bureau of Alcohol,* 127 F.4th 583, 590 (5th Cir. 2025); *Nguyen v. Bonta,* 140 F.4th 1237 (9th Cir. 2025) (Second Amendment covers any "meaningful constraints on the right to acquire firearms."); *McCoy v. BATFE,* 140 F.4th 568 (4th Cir. 2025) (Quattlebaum, J. Dissenting) (same); *Ezell v. City of Chicago,* 651 F.3d 684, 704 (7th Cir. 2011) (Second Amendment encompasses "a corresponding right to acquire [firearms] and maintain proficiency in their use."); *Beckwith v. Frey,* 766 F. Supp. 3d 123, 131 (D. Me. 2025) (same).

Even if the Court assumes Conn. Gen. Stat. §§ 29-33(f) and 29-35(a)(2) burden presumptively protected conduct and do not constitute a "presumptively lawful" condition on "the commercial sale of firearms," the challenged provisions are constitutionally sound because they are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S at 19. Both regulations are consistent with the principles of traditional firearm regulation and are amply supported by historical analogues.

The historical analysis required by *Bruen* does not impose "a regulatory straightjacket." 597 U.S. at 30. Instead, the government must justify a regulation by establishing that it falls within a historical tradition of laws that are "relevantly similar," in the sense that they "impose a comparable burden on the right of armed self-defense" that "is comparably justified." *Id.* at 29. The government therefore need only "identify a well-established and representative historical analogue"—not a "historical twin" or "dead ringer"—to the challenged law. *Id.* at 30. "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi,* 144 S. Ct. at 1896 (emphasis added).

In order to meet his burden, the Defendant need only identify historical regulations that are "analogous enough [to the challenged laws] to pass constitutional muster." *Id.* (quoting *Bruen,* 597 U.S. at 30). And when the challenged regulation "implicat[es] unprecedented societal concerns or dramatic technological changes," "a more nuanced approach" is required because "[t]he regulatory challenges" of today are "not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 27.

          **a.**    **Conn. Gen. Stat. § 29-33(f) requires a "more nuanced" approach as it addresses unprecedented societal concerns.**

Here, unlike the "fairly straightforward" historical analysis in *Bruen* that required the government to identify a "distinctly similar historical regulation," *id*. at 2131, a more nuanced

31

analogical approach is required as to § 29-33(f) because, during the Founding and Reconstruction Eras, most gun owners did not purchase more than one handgun at a time—let alone four or more—so limits on quantity of commercial sales of handguns were not necessary. Further, firearms were simply not available for bulk purchases, and firearms trafficking was not a societal concern as it is today.

Connecticut's commercial sale limit was intended to offer a solution to a modern problem: straw purchasing and illicit bulk firearm sales. As former Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent Bisbee explains, purchases of multiple firearms in a short period often indicates illegal trafficking and criminal use of firearms. See Ex. A. Often, purchasers of multiple firearms transport such firearms across state lines and sell them to individuals who possess the firearms for criminal use. There is no question that "firearms traffickers utilize multiple sales to procure quantities of firearms for illegal use" and commercial sales limits like Connecticut's are designed for and effective in "reduc[ing] profit motive and decreas[ing] the chances of illegal trafficking" and straw purchases. Id., ¶ 18. Such straw purchases and firearms trafficking like those Conn. Gen. Stat. § 29-33(f) were intended to address have plagued the country in more recent years and are not something that "the Founders themselves could [have] confront[ed]" and were not a "general societal problem" in the 18th century. *Bruen*, 142 S. C.t at 2132.

As Professor McCutchen explains, during the late colonial and Early Republic eras, governments did not need to address the problem of large gun purchases and illegal firearms trafficking: most individuals did not own and could not purchase more than one gun, period. Ex. C, Pgs. 13-14. Instead, mass produced weapons were not manufactured in the nation and most weapons were instead painstakingly maintained within families and repaired by gunsmiths. *Id.*

Even as times changed in the nineteenth century and manufacturing developed, firearms manufacturing still did not allow for the kinds of bulk purchases that occur today. Ex. D, Pgs. 32-33. Most firearms were sold in hardware stores, general stores, and pawn shops that maintained a limited inventory, not the "big box" stores that exist in modern America. *Id.* "No 'Guns-R-Us' outlets existed in the 1600s, 1700s, or most of the 1800s." Ex. B, ¶ 3. And even in the unlikely event that such historical shops had more than three handguns available for purchase, the high prices of firearms—about $1,157.87 per weapon in today's dollars—meant the "acquisition of numerous firearms was fairly cost-prohibitive." Ex. D, Pg. 33.

Further, straw purchases and firearms trafficking were not a problem that could have existed for most of the nation's history because no transportation infrastructure allowed for movement of mass purchased firearms across state lines. As Professor Spitzer noted, "one significant impetus to the cultivation of illicit interstate gun trafficking was the construction of the interstate highway system" known as the "primary corridors for 'iron pipeline' gun trafficking." Ex. B, ¶ 4. No such form of non-public transportation allowing for easily concealable transit of mass purchased weapons existed until the mid-twentieth century. Thus, commercial sales limits like Conn. Gen. Stat. § 29-33(f) were designed "to address a distinctly modern problem: to discourage those who are legally qualified to purchase firearms from acquiring a large number of guns that might be sold to others who are legally prohibited from making such a purchase." *Id.* ¶ 7.

Ultimately, governments during the Founding and Reconstruction eras did not have to confront the ability to purchase many firearms at a given time or any of the dangers associated with bulk purchases. As a result, this Court must approach the historical analysis with nuance, and the inquiry into historical analogues is broadened. *See, e.g., Alaniz,* 69 F.4th at 1129-30 (explaining

that the use of firearms in illegal drug trafficking "is a largely modern crime" requiring a "more nuanced approach"). Because the Court must apply this more nuanced approach, the Defendant's burden to identify a comparable historical analogue is even more relaxed than the already lenient historical standard typically applied when there is no unprecedented societal concern at issue. *See Rahimi*, 144 S. Ct. at 1933.

> **b.    Conn. Gen. Stat. § 29-33(f) is consistent with a historical tradition of broad regulations on the commercial sale and purchase of firearms in the interest of public safety.**

Governments have long enjoyed a tradition of regulating the commercial sale of firearms and ammunition in various forms, and Connecticut's monthly commercial sales limit is no different. In the early days of the Colonial and Founding Eras, purchase and storage of gunpowder, which was required for the use of firearms, was highly regulated, and often in ways that imposed a far greater burden on Second Amendment rights than the challenged commercial sales limit.

Similarly, states and local governments frequently restricted the time, place, and manner in which individuals could sell firearms, and to whom they could be sold. Such regulations controlled "where and to whom individuals could sell guns" and many served two primary goals: "(1) controlling and tracing the sale of firearms and (2) ensuring dangerous individuals did not obtain firearms." *United States v. Holton*, 639 F. Supp. 3d 704, 711-712 (N.D. Tex. 2022); *see also United States v. Serrano*, 651 F. Supp. 3d 1192, 1212 (S.D. Cal. 2023).

While Connecticut's commercial sales limit does not "precisely match" these historical precedents, it is "consistent with the principles that underpin our regulatory tradition." *Antonyuk,* 120 F.4th 941, 967 (citing *Rahimi,* 144 S. Ct. at 1933). Because the commercial sales limit is "analogous enough" to gunpowder restrictions and time, place, and manner restrictions on

commercial firearms sales, it "comports with the principles underlying the Second Amendment" and must be upheld. *Id.*

### i.    Gunpowder regulations

In the Colonial and Founding eras, gunpowder was highly regulated. Individuals were not free to stockpile as much gunpowder and ammunition as they wished or to store it as they wished. *See, e.g.*, 1706-7 Mass. Acts ch. 4, reprinted in Acts and Resolves Passed by the General Court 588 (1869), available at https://tinyurl.com/27ubvvvn; A Law for the Better Securing of the City of New York from the Danger of Gun Powder (1763), https://tinyurl.com/5273xd57; 1821 Me. Laws 98, chap. 25, § 5, https://tinyurl.com/up948844. Colonial era restrictions often limited how much gunpowder could be stored in the home and citizens would often have to store such excess gunpowder in the public "magazine." These gunpowder storage laws have been historically regarded as appropriate exercises "of the police power." *Brown v. Maryland,* 25 U.S. 419, 443 (1827); Ex. B, ¶¶ 26-30. Since munitions, and particularly possession of excessive amounts of munitions, posed a uniquely dangerous risk to society, the government could lawfully regulate them. See *id.*

For instance, some jurisdictions placed a predetermined limit on the quantity of gunpowder a citizen could store in his home: New York City (28 pounds) 1784 N.Y. Laws 627, *An Act to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof*, ch. 28; Philadelphia (30 pounds) *A Digest of the Acts of Assembly, and the Ordinances, of the Commissioners and Inhabitants of the Kensington District of the Northern Liberties: for the Government of that District*, Pg. 45-47, Image 48-50 (1832) available at The Making of Modern Law: Primary Sourcesor; Portsmouth, New Hampshire (10 pounds) 1786 N.H. Laws 383-84.

35

Other jurisdictions, like Connecticut, went farther and empowered local officials to determine, based on their "opinion," whether a certain "quantity of gunpowder" in the possession of a private citizen "may endanger the persons or dwellings of any individuals whatsoever." If so, the officials could order the owner to move their gunpowder to "some safe and convenient place within said town" at a time and place of their choosing. If the citizen failed to do so, the officials could move it "to such place within said town, as in their opinion shall be deemed safe and convenient." The officials even retained "a lien upon the said powder for all necessary expenses in removing and keeping the same." 1832 Conn. Acts 391, *An Act Regulating the Mode Of Keeping Of Gunpowder,* Chap. 25, § 1-2. In other words, the first selectman or mayor or town council of a locality had the right to determine how much stored gunpowder was "too much" for a private citizen and could force him to move it—or actually seize it.

It is not difficult to understand why such regulations were in place. Storing too much gunpowder in a private home could lead to an explosion or a fire that could threaten public safety. *See Saul Cornell and Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 511-12 (2004) ("the point of these statutes, was, as they themselves proclaimed, to protect communities from fire and explosion… [and] also provided a check on the creation of a private arsenal."). Indeed, the Boston regulation from 1706 states the reasons for mandating that all gunpowder—with limited exceptions none of which applied to private homes—be stored in the "publick magazine":

> [P]reventing the great loss and danger by casualties befalling the same, and considering the imminent hazard of keeping powder in storehouses with other goods and merchandises, or in or near to dwelling houses…

Legislators then understood that limiting the right to "keep," in the form of a restriction on the amount of gunpowder possessed, was a perfectly permissible limitation on the right of armed self-

defense, which was a preexisting concept in English law later enshrined in the Second Amendment. *See Bruen,* 142 S. Ct. at 2127 (recognizing the Second Amendment "codified a pre-existing right . . . inherited from our English ancestors."). Such regulations, like the Boston one, existed for 70 years prior to the Founding of the United States and 85 years prior to the enactment of the Second Amendment. Similar regulations continued to exist in various states and localities for decades after the Second Amendment's enactment.

As a district court in Oregon held, "[l]arge quantities of gunpowder posed a threat to public safety at the time of the Second Amendment's ratification in 1791. In the late-eighteenth century, colonies and states responded to this danger by regulating the amount of gunpowder that could be stored in a given area and placed restrictions on the manufacture, inspection, sale, and transport of gunpowder." *Kotek*, 2023 U.S. Dist. LEXIS 121299, at *51. Much like the challenged statute, such regulations did not deprive a law-abiding citizen of their ability to defend themself either in the home or in public.

In this way the "how" of these gunpowder restrictions was far more onerous than Connecticut's commercial sale limit of three handguns per month. Firearms of the Colonial and Founding era required gunpowder to be poured into the muzzle of a firearm before firing, either from a paper cartridge or powder horn. As *Kotek* put it, "[b]efore 1791, firearms could not fire without gunpowder." *Kotek*, 2023 U.S. Dist. LEXIS 121299, at *50. This means limitations on the storage or keeping of gunpowder limited the amount of times a person could *use any weapon*. Put simply, at that time, once out of gunpowder, the ability to defend oneself with a firearm was nonexistent. The challenged commercial sales limit does not come close to this level of burden on the right of armed self-defense. Indeed, the law does not even fully limit how many firearms one can acquire in a month and as a practical matter, it "limits" a citizen to purchasing thirty-six

handguns per year. The very fact that no Plaintiff has even attempted to purchase this many firearms or indeed even four firearms in a thirty day period, demonstrates the lack of impact this commercial regulation has on a citizen's right of armed self-defense  Even if one could argue that the law did burden the right of armed self-defense, it certainly does so far less than by a law requiring excess bullets, firearms, or gunpowder to be stored in a communal location based on the opinion of a local official.

> ii.    **Time, Place, and Manner Sales restrictions are relevantly similar to the commercial sales limit.**

In addition to the proliferation of gunpowder regulations, there is a robust historical tradition of imposing sales restrictions limiting time, place, and manner of firearm sales. During the Colonial and Founding eras, various governmental bodies enacted laws that controlled the sale and transfer of firearms by different means, similarly to the challenged commercial sales limit here. In some states, colonies, and municipalities these sales restrictions restricted sales by geographical area, preventing sales to individuals outside the regulated jurisdiction; others imposed commercial sales limits by regulating or prohibiting sales to individuals deemed dangerous.

For example, Connecticut restricted firearms sales by its residents outside the colony in 1646. See 1 J. Hammond Trumbull, *Public Records of the Colony of Connecticut* 137-39, 145-46 (1850). In 1676, Virginia authorized the sale of firearms and ammunition only to "his majesties loyal[] subjects inhabiting this colony." 2 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* 403 (1823). A 1652 New York law *completely* outlawed "Illegal Trade in Powder, Lead and Guns" by "Private persons," similarly limiting sales of firearms, albeit in the reverse of the challenged

restriction, by limiting (indeed, banning) private sales instead of commercial ones. E.B. O'Callaghan, Law & Ordinances of New Netherland, 1638-1674 128 (1867).

In addition to sales restrictions based on geographical area and time, governments enacted laws and regulations on weapons sales to particular groups based on perceived dangerousness of the buyer. For example, many states prohibited or regulated commercial sales by age during the Nineteenth century,[10] and others enacted laws restricting sales based on race. In particular, colonists perceived Native Americans as a threat to public safety due to hostilities between colonists and Native people and passed many laws regulating the commercial trade and sale of firearms to them.[11]

States also passed laws forbidding the sale of firearms to intoxicated individuals or otherwise "impaired" individuals because of the concern for impulsive firearm violence. *See State v. Christen*, 958 N.W.2d 746, 766 (Wis. 2021) (Hagerdon, J., concurring) (citing An Act to Prevent the Carrying of Concealed Weapons and for Other Purposes, 1878 Miss. Laws 175, § 2); See Ex. D, Pg. 29; Ex. E, Pgs. 39-41. Some jurisdictions also enacted provisions to keep enslaved persons and free African Americans from purchasing arms. See Ex. E, Pg. 40. "[U]nder a Virginia law, any person found within an Indian town or more than three miles from an English plantation with arms or ammunition above and beyond what he would need for personal use would be guilty of

---

[10] For example, see Alab. 1856 ch. 26 p. 17; Tenn. 1856 ch. 81 p. 92 §2; Ind. 1875 ch. 40 p. 59; Geo. 1876 ch. 128 p. 112; Miss. 1878 ch. 46 p. 175; Ohio 1880 S.B. 80 p. 79; Penn. 1881 ch. 124 p. 111; Dela. 1881 ch. 548 p. 716; Flor. 1881 ch. 3285 p. 87; Ill. 1881 "Criminal Code" §2 p. 73; Mary. 1882 ch. 424 p. 656; W. V. 1882 ch. 135 §7 p. 421; Kan. 1883 ch. 105 p. 159; MO 1883 p. 76 "An Act to amend section 1274, article 2, chapter 24 of the Revised Statutes of Missouri, entitled 'Of Crimes and Criminal Procedure,' "; Wisc. 1883 ch. 329 p. 290; Iowa 1884 ch. 78 p. 86; Okla. 1890 ch. 25 art. 47 §3 p. 496; Lou. 1890 ch. 46 p. 39; Va. 1890 ch. 152 p. 118; Wyo. 1890 ch. 73 §97 p. 140; N. C. 1893 ch. 514 p. 468; Tex. 1897 ch. 154 p. 221.

[11] Although these laws would be unconstitutional today and the Defendant does not endorse their application in the past, they are still relevant to traditions of firearm regulation. See William Baude & Stephen E. Sachs, Originalism & the Law of the Past, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past doctrine, not to that doctrine's role in past society.").

the crime of selling arms to Indians, even if he was not actually bartering, selling, or otherwise engaging with the Indians." *Teixeira*, 873 F.3d at 685 (citing Acts of Assembly, Mar. 1675-76, 2 William Waller Hening, at 336– 37 (1823)); *but see Michelle Nguyen v. Bonta,* 720 F. Supp. 3d 921, 937 (S.D. Cal. 2024) (holding it may not "permissible to rely on [these] laws" because they involve "race or ethnicity-based classifications" and "would be unconstitutional today.") Those laws, like the challenged law here, served as a mechanism for States to prevent individuals they perceived as dangerous persons from acquiring and possessing firearms, by placing limits on sales of firearms.

These particular restrictions were enacted alongside increasingly numerous taxing, licensing, and tracking schemes imposed on sellers of firearms, rather than individuals themselves. In 1827, Maryland enacted a series of statutes requiring a "license to trade," and Tennessee, Missouri, Pennsylvania, and California passed similar statutes in the midcentury "requiring the licensing of merchants, retailers, and wholesalers."[12] And in 1868, Alabama required licenses for over thirty occupations and businesses, including for "dealers in firearms." See Alabama Acts of the General Assembly 329-35 (1868).   States also imposed taxes on sales of weapons as a means of regulating and restricting ownership. Such laws even included taxes based on quantity of firearms purchased or owned, often focusing on handguns, as Connecticut's commercia sales limit

---

[12] See An Act to Prevent the Sale of Pistols, 1879 Tenn. Pub. Acts 135-36, ch. 96, § 1, *available at* https://firearmslaw.duke.edu/laws/1879-tenn-pub-acts-135-36-an-act-to-prevent-the-sale-of-pistols-chap-96-%c2%a7-1/ (prohibiting the sale of pistols without a license); An Act To Amend An Act Entitled "An Act To Provide For A License For The Sale Of Pistols Or Pistol Cartridges Within The Limits Of This State," 1893 S.C. Acts 426, § 2, *available at* https://firearmslaw.duke.edu/laws/1893-s-c-acts-426-an-act-to-amend-an-act-entitled-an-act-to-provide-for-a-license-for-the-sale-of-pistols-or-pistol-cartridges-within-the-limits-of-this-state-%c2%a7-2/ (authorizing counties to issue licenses to sell pistols); and The Revised Statutes of South Carolina, Containing the Code of Civil Procedure, and the Criminal Statutes (1890), ch. 28, § 490, *available at* https://firearmslaw.duke.edu/laws/john-e-breazeale-the-revised-statutes-of-south-carolina-containing-the-code-of-civil-procedure-and-the-criminal-statutes-also-the-constitutions-of-the-united-states-and-of-the-state-and-the-rule/ (requiring a license to sell or offer to sell pistols and rifles).

40

does. *See, e.g. An Act to Suppress the Use of Bowie Knives,* 1837 Ala.Laws 7, § 2 (imposing a $100 tax on each Bowie knife sold in the state); *An Act Entitled "Revenue,"* 1856-1857 N.C. Sess. Laws 34, ch. 34, § 23, pt. 4 (taxing pistols); *An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same,* 1866 Ga. Law 27, § 3 (taxing each gun, pistol, musket, or rifle over the number of three owned on a plantation); *An Act to Tax Guns and Pistols in the County of Washington*, 1867 Miss. Laws 327, § 1 (taxing each gun or pistol owned in the county); 1867 Ala. Code 169, § 10 (taxing pistols and revolvers in the possession of private individuals). Finally, aside from direct licensing of weapons purchasers, "at least 17 states required those who sold or otherwise transferred guns or other weapons to others to record information about the buyer, with that information to be maintained and subject to possible later examination." Ex. E, ¶ 68-69. Such schemes were meant "to acquire and maintain information about those who obtained the weapons in question and when, for future reference or inspection by government officials or others." *Id.*

Considered as a whole, this history demonstrates that Founding and Reconstruction era legislatures would have believed it well within the power of the government to limit the authorization of commercial sales of handguns from licensed firearms dealers. As Professor Rivas noted, "point-of-sale regulations (be they taxes or sales prohibitions)" did not "arouse[] controversy or generate[] a recorded constitutional challenge during the nineteenth or early twentieth centuries." Ex. D, Pg. 31. The law here, also a commercial sales restriction not even imposed on the purchaser, is supported by "relevantly similar" historical analogues. Those analogues imposed comparable burdens: they imposed administrative requirements that restricted firearm sales and limited the ability of individuals to sell firearms. If anything, the challenged commercial sales limit is *less* burdensome than other restrictions imposed throughout history—for

instance, laws which banned entire classes of persons from purchasing weapons at all. Finally, these historical laws were comparably justified by the need to prevent firearms from being sold outside specific jurisdictions or ending up in the hands of those believed ton present particular threats to public safety. Accordingly, the commercial sales limit is more than consistent with a historical tradition of regulation, and Defendant is entitled to judgment as a matter of law.

> **a. Governments have long regulated public carry, including manner of carry, and Conn. Gen. Stat. § 29-35(2) is entirely consistent with this historical tradition.**

Tracing a historical tradition of regulation consistent with Connecticut's open carry restrictions is even simpler. Indeed, every court to consider similar open carry restrictions since *Bruen* have agreed that a historical tradition of regulating manner of carry supported such laws, including as recently as two weeks ago. *See Frey v. Nigrelli,* 661 F. Supp. 3d 176, 199 (S.D.N.Y. 2023) (finding New York's open carry restrictions consistent with historical tradition); *Baird v. Bonta,* 709 F. Supp. 3d 1091, 1138 (E.D. Cal. 2023) ("for many years before and after the Second Amendment was adopted, American governments placed limits on how people could carry the weapons for self defense in public.");[13] *O'Neil v. Neronha*, No. 23-070 WES, 2025 U.S. Dist. LEXIS 148068, at *7 (D.R.I. Aug. 1, 2025) ("Defendants' application of the Firearms Act to regulate Plaintiffs' manner of public carry is within the Nation's historical tradition of regulation. Plaintiffs' argument to the contrary is foreclosed by *Bruen* itself"); *Abed v. United States*, 278 A.3d 114, 117 (D.C. 2022).

The Supreme Court in *Bruen* itself noted "[t]he historical evidence from antebellum America does demonstrate that the *manner* of public carry was subject to reasonable regulation . .

---

[13] The district court decision in *Frey* has been appealed and is pending at the Second Circuit. *See Frey v. Bruen*, No. 23-365. Similarly, the plaintiffs in *Baird* appealed to the Ninth Circuit, where the case again remains pending. *Baird v. Bonta,* No. 24-565.

. . State's could lawfully eliminate one kind of public carry — concealed carry — so long as they left open the option to carry openly." *Bruen,* 142 S. Ct. at 2150 (emphasis in original). Connecticut's open carry restriction "does just this, albeit in reverse: it regulates Plaintiffs' manner of public carry in that it limits their right to open carry but leaves unaffected their right to concealed carry." *O'Neil*, 2025 U.S. Dist. LEXIS 148068, at *8.

Not only did historical regulators place restrictions on manners of public carry, but they often "eliminate[d] one kind of public carry" altogether. *Bruen*, 597 U.S. at 59 (emphasis omitted). As the Supreme Court recognized, "public-carry restrictions proliferate[d]" in the period "after the ratification of the Second Amendment in 1791." *Bruen*, 597 U.S. at 50. As noted above, many restrictions eliminated concealed carry: Dr. Spitzer identified 89 concealed carry prohibitions enacted by 34 states from the post-Civil War period through the early 1900s. Ex. E, Pg. 22. And, from the 1600s through the early 1900s, *every single state* (plus D.C.) enacted laws regulating manner of carry by penalizing concealed weapons carrying. *Id.,* Pg. 45.

Though these restrictions most often "proscribed the concealed carry of pistols and other small weapons," certain jurisdictions also imposed restrictions on open carry. *See Bruen,* 597 U.S. at 52 n.16. For example, a 1721 Pennsylvania law prohibited anyone from "carry[ing] a gun or hunt[ing] on the improved or inclosed lands of any plantation other than his own." Ex. C, Pg. 8. A 1760 Pennsylvania law similarly prohibited the carrying or use of guns, particularly for hunting "on any inclosed [sic]or improved lands…". This included "on or near any of the king's highways, in the open streets of the city of Philadelphia, or in the gardens, orchards and inclosures, adjoining upon, and belonging to any of the dwelling-houses within the limits of the said city, or suburbs thereof, or any of the boroughs or towns within this province…" *Id.,* Pg. 8. Indeed, from the 1600s through the 20th century, at least 79 laws were enacted in at least 39 states restricting the open

carrying of weapons in various ways. Ex. E, Pg. 45. For example, Florida enacted an 1838 law that criminalized the concealed carrying of named weapons but also added that "all persons carrying said weapons openly shall pay" a then considerable regulatory tax of "ten dollars per annum." 1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838); $10 in the 1830s would equal $327 in 2023 dollars. https://www.officialdata.org/us/inflation/1830?amount=10. And an 1867 Kansas state law penalized as a misdemeanor anyone "who shall be found within the limits of this State, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon." 1867 Kan. Sess. Laws 25, CHAPTER XII. Similar restrictions abound. See Ex. E, ¶ 89, collecting statutes restricting open carry. This robust historical tradition of regulating manner of carry—whether openly or concealed—comports with the minimal restrictions Connecticut has imposed.

Dr. McCutchen points to the history of manner of carry regulations in Washington D.C. when analyzing the nation's tradition regarding such regulations. She relies on historical analysis performed by Mark Frassetto, who argues that through the first half of the nineteenth century, Washington D.C. operated under the Statute of Northampton, which it adopted from Maryland. Ex. C, Pg. 12, citing "The First Congressional Debate on Public Carry and What it Tells Us About Firearms Regionalism," Campbell Law Review 40, no. 2 (2018): 340. In 1857, the City Council for the City of Washington codified a ban on public carry, amended the following year to include a prohibition on concealed carry. *Id.* In 1871, after the merging of the three District governments, the newly unified government passed an ordinance making it illegal for anyone in Washington D.C. "to carry or have concealed about their persons any deadly or dangerous weapons." *Id.* By passing this ordinance, the district government (which included a governor and an 11-member committee appointed by the President of the United States, and a 22-member assembly elected by local constituents) created legislation for a federal district based on legal precedent that regulated

the "right to bear arms." Congressional debates surrounding public carry laws in Washington during the 1890s also reveal that "there was no national consensus regarding a right to public carry under the second amendment." *Id.* In other words, if the Congress openly debated and even at one point in 1857 thought it was permissible under the Second Amendment to ban *all* public carry, one cannot argue that a ban on open carry would have been unthinkable to the Congress who passed the Fourteenth Amendment about a decade later.

Further, in addition to general manner of carry laws, there were many laws which limited openly carrying weapons in a manner that might amount to "affray," sometimes called "going armed" laws. See Ex. B, Pg. 12; Ex. D Pgs. 11-12. Such laws derived from the Statute of Northampton and prohibited traveling armed in public "outside of a well-defined list of exceptions was a threat to the peace because 'it striketh a fear and Terror in the King's Subjects.'" Id., ¶ 29; Ex. D, ¶ 22. One early North Carolina law, for example, allowed for apprehension of any individual who "shall go or ride armed with unusual and offensive Weapons, in an Affray, or among any great Concourse of the People." JAMES DAVIS, THE OFFICE AND AUTHORITY OF A JUSTICE OF THE PEACE 13 (New Bern, N.C., James Davis 1774). Some later surety laws addressed gun carrying by singling out and creating criminal penalties for those "who shall ride or go armed offensively." See Ex. B, Pg. 12; 1795 Mass. Laws 436, ch. 2, An Act for Repealing an Act, made and passed in the year of our Lord, one Thousand six Hundred and Ninety-two, entitled, "An Act for punishing Criminal Offenders," and for reenacting certain provisions therein."[14] Such laws persisted through the antebellum period. Ex. B, Pgs. 15-16. Between 1800 and 1850,

---

[14] 1795 Mass. Ch. 2, 436 (ordering officials to "cause to be staid and arrested" anyone who, among other things, "shall ride or go armed offensively, to the fear or terror of the good citizens of this Commonwealth.").

Tennessee, Maine, and Delaware emulated this approach.[15] Ex. D, Pgs. 12-14. Other states drafted similar statutes that limited carry in a manner that might cause "fear" or "terror" throughout the nineteenth century.[16]

The stated purposes for these regulations are similar to Connecticut's open carry restrictions: "[t]he common law recognized that armed travel by its very nature provoked terror." Ex. B, ¶ 35. The "why" behind Connecticut's open carry restrictions track closely with the "why" of these various affray laws: "[w]hat this language in the underlying bill attempts to do is to stop someone from parading down a street, openly carrying a firearm in such a manner so as to cause

---

[15] Tennessee (1801): 1801 Tennessee ch. 22, § 6, "That if any person…shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice…to bind such person…to their good behavior… ." Maine (1821): 1821 Maine ch. 76, "An Act describing the power of Justices of the Peace in Civil and Criminal Cases," 285, §1. "That it shall be within the power, and be the duty of every Justice of the Peace within his county, to punish…all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State… ." Delaware (1852): Revised Statutes of the State of Delaware, to the Year of Our Lord 1852 (Dover: S. Kimmey, 1852), Title XV, ch. 97, 333 § 13. "Any justice of the peace may also cause to be arrested and bind to surety of the peace all affrayers, rioters, breakers and disturbers of the peace, and all who go armed offensively to the terror of the people, or are otherwise disorderly and dangerous."

[16] Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835 (Boston: Dutton & Wentworth, 1836), ch. 134, 70 § 16. This section cites "Persons who go armed may be required to find sureties for the peace &c., 1794, 26 § 2," which appears to be a reference to 1795 Mass. ch. 2, 436; Wisconsin (1839): 1838–1839, Wisconsin, Statutes of Wisconsin, "An Act to Prevent the Commission of Crimes," 381 § 16; Maine (1840): Revised Statutes of the State of Maine, Passed October 22, 1840 (Augusta: W. R. Smith, 1841), ch. 169, "Of Proceedings for the Prevention of Crimes," 709 § 16; Michigan (1846): Revised Statutes of the State of Michigan, Passed and Approved May 18, 1846 (Detroit: Bagg & Harmon, 1846), Title 31, ch. 162, "Of Proceedings to Prevent the Commission of Crime," 692 § 16; Virginia (1847): 1847 Virginia, 1847–1848 Session, Title 3, ch. 14, "Of Proceeding to Prevent the Commission of Crimes," 129, §16; Minnesota (1851): Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851 (St. Paul: J. M. Goodhue, 1851), ch. 12, "Of Proceedings to Prevent the Commission of Crimes," 528 § 18; Oregon (1853): 1853 Oregon, General Laws, 5th Regular Session, 220 § 17. See also John Purdon, et al, comps., Digest of the Laws of Pennsylvania (Philadelphia: Kay & Brother, 1862), 250, § 6 and accompanying notation.

concern..["17] The Connecticut Legislature specifically intended to address "people walking around carrying guns… doing it to intimidate others."[18]

And the open carry restriction here only minimally burdens Second Amendment rights, leaving open an entire manner of carry—concealed—that is not impacted at all, just like many other historic manner of carry laws. *See Frey*, 661 F. Supp. 3d at 199 ("The fact that the manner in which New York allows public carry — concealed rather than open — is not to Plaintiffs' liking does not mean that enforcement against open carry is unconstitutional. …"). In fact, Connecticut's open carry restriction is even less restrictive than some of the open carry bans identified by Dr. Spitzer, which did not leave open the possibility of concealed carry of the prohibited weapons.

Ultimately, the challenged open carry restriction is entirely consistent with the kind of laws that states and localities have passed regulating manner of carry. It leaves open an entire manner of carry by which residents may defend themselves by permitting concealed carry. Defendant is therefore entitled to judgment as a matter of law.

## IV.    CONCLUSION

For all the foregoing reasons, the Defendant respectfully asks this Court to grant his motion for summary judgment.


                                        DEFENDANT
                                        Doyle

                                        WILLIAM TONG
                                        ATTORNEY GENERAL

---

[17] Judiciary Committee Joint Favorable Report, Public Act No. 23-53.
[18] Testimony before the Connecticut Joint Committee on the Judiciary on An Act Addressing Gun Violence, P.A. No. 23-53 (March 5, 2023) quoting Elsa Peterson Obuchokowski (voter in Norwalk, CT) and Jonathan Perloe (Communications Director for CT Against Gun Violence).



James M. Belforti
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06105
Tel: (860) 808-5450
Fax: (860) 808-5591
Federal Bar No. ct30449
E-Mail: james.belforti@ct.gov

/s/ *Janelle R. Medeiros*

Janelle R. Medeiros
Assistant Attorney General
165 Capitol Avenue
Hartford, CT 06105
Federal Bar #ct30514
E-Mail: janelle.medeiros@ct.gov
Tel.: (860) 808-5450
Fax: (860) 808-5590

## **CERTIFICATION**

I hereby certify that on August 15, 2025, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system. Parties may access this filing through the Court's system.

/s/ *Janelle R. Medeiros*

Janelle R. Medeiros
Assistant Attorney General

48