# Exhibit A

We The Patriots USA, Inc. v. John P. Doyle, Jr.
United States District Court, District of Connecticut
Civil Action No. 24-1054

Declaration of Joseph L. Bisbee

I, Joseph Bisbee, declare as follows:

1.      I am over the age of 18 and have personal knowledge of all the facts stated in this declaration.

2.      I am the principal officer of Armed With Knowledge (AWK), a business aimed at education and outreach in regards to firearms issues.  AWK focuses on several areas including public education, policy development, strategies to reduce firearms related violent crime, and expert consulting.

3.      Prior to creating AWK, I was employed as a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for more than 25 years.  During my career as an ATF special agent I focused on firearms trafficking investigations, analyzing how criminals acquire firearms, training other law enforcement officers on firearms investigations, assessing and recommending "best practices" to agencies on issues involving illegal firearms, and other issues related to the illegal acquisition and disposition of firearms both domestically and internationally.  See attached "Qualifications" sheet for an overview of my ATF career.

4.      I have been involved in hundreds of investigations into illegal firearms trafficking and have been the case agent on numerous investigations involving organized groups illegally acquiring and disposing of firearms.  These investigations have involved thousands of firearms. The majority of these cases involved the interstate movement of firearms, but I have also been involved in the investigation of international trafficking in firearms.  When attempting to identify individuals involved in the illegal trafficking of firearms, I relied on a number of firearms trafficking indicators.  One in particular is commonly referred to as a "multiple sale".  This act of purchasing more than one handgun from a licensed retail gun dealer within five consecutive business days triggered a notification be sent to ATF.  The presence of this indicator alone

provided important data and when combined with a crime gun recovery, provided a wealth of information. During my time investigating illegal firearms trafficking I frequently saw firearms that had been recovered in crimes originate from a multiple sale. These crime gun recoveries are "traced" in order to determine their first retail purchaser. Firearms tracing is the systematic tracking of the history of a gun from manufacturer through the wholesale and retail distribution chain and ultimately to a retail purchaser. ATF is the only agency able to perform crime gun traces on a national level. Crime gun recoveries traced back to a multiple sale are concerning due to the chances that all the firearms purchased during the multiple sale are circulating amongst the criminal element.

5.    I have been requested by the Attorney General's Office for the State of Connecticut to provide my opinion on if and how "multiple sales" of firearms are related to illegal firearms trafficking and subsequent illegal activity. As previously mentioned, the traditional definition of a "multiple sale" has been an individual buying two or more handguns from a licensed gun dealer within five consecutive business days. This definition has evolved for certain States to now include some long guns.

6.    I have previously testified as an expert witness in U.S. District Court and Superior Court (Washington, D.C.). I have testified to the identification of firearms, as well as the movement of firearms across state lines. I am also one of very few individuals that have been recognized as an expert in firearms trafficking in federal criminal court (U.S. v. Thomas Bing, United States District Court for the District of Columbia No. 01cr00270–05). The Bing case is a good example of the interplay between multiple sales and illegal firearms trafficking. This case involved a group of individuals illegally acquiring firearms from gun dealers in the State of Georgia. With the help of multiple sales the group trafficked at least 35 firearms from Georgia for criminal use elsewhere, including Washington, D.C.

7.    Early in my career as an ATF special agent, I learned the significance of monitoring multiple purchase information. During this time period, multiple purchases were not computerized but hard copy forms were mailed to field offices. My office at the time placed the

forms in a file for agents to conduct further analysis.  The file was usually barren as agents would wait for mail to be delivered in order to be the first to receive the multiple sales forms.  I quickly learned from experienced agents the fact that multiple purchases were a key firearms trafficking indicator.

8.    As I progressed in my career as an ATF special agent and became known for perfecting multi-defendant, complex conspiracy firearms trafficking investigations, I continued to utilize multiple sales information to identify criminal organizations.    While technically speaking the transfer of one firearm from the legal marketplace to the illicit marketplace is considered firearms trafficking, investigative resources were better utilized when pursuing criminals dealing in larger volumes of firearms.  Given many criminals prefer firearms that are "new in the box", traffickers benefit from multiple sales.  With profit margins low in the firearms trafficking arena, the ability to deal in volume is appealing.  While the federal requirement of reporting multiple sales can provide investigative leads, the fact remains that trafficked firearms associated with multiple purchases are guns already in the hands of criminals.  Rarely, if ever, do all firearms associated with illegal trafficking get recovered before at least some are used in a crime.

9.    An example of this is an investigation I conducted on Reginald Edwards.  Edwards lived in Ocala, Florida, and was making multiple purchases of firearms for criminals in Washington, D.C.  I initiated this case after one of Edwards' firearms was used in a drive-by shooting that injured a child.  During my investigation, none of the roughly ten firearms purchased by Edwards were recovered prior to being involved in a crime.  Edwards was convicted on federal firearms charges in the Middle District of Florida.

10.    Another example is an investigation I conducted on Rasi Robinson.  Robinson had previously been convicted of a firearms offense in Washington, D.C., but told police he "would get more guns once that case was over" (The Columbus Dispatch, May 30, 2011, https://www.dispatch.com/article/20110530/news/305309835).  Robinson moved to Columbus, Ohio, and kept that promise.  Robinson recruited a number of straw purchasers and began

illegally supplying firearms to criminals in Washington, D.C.  In total, I was able to identify 21 firearms associated with Robinson's criminal enterprise.  On a number of occasions, Robinson instructed the straw purchasers to buy multiple firearms at one time.  The difficulty in coordinating straw purchasers often leads traffickers to engage in multiple sales.  The firearms involved in this case were recovered in a number of crimes including illegal firearms possession, drug offenses, and a homicide committed by Robinson himself.

11.    Of particular note during my time assigned to a Firearms Trafficking Group in Washington, D.C., is Virginia maintained a "one handgun per month" law.  Meaning under most circumstances unlicensed individuals could only purchase one handgun within a 30-day period. During this time, I was recognized in a Washingtonian Magazine article as the "top federal gun-hunter in D.C." and quoted "(t)he one-gun-a-month law in Virginia has affected people's ability to bring a quantity of guns into the District", thus forcing illegal traffickers to acquire firearms from other States (https://www.washingtonian.com/2008/03/01/dc-gun-rights-do-you-want-this-next-to-your-bed/).

12.    This Washingtonian Magazine article also highlighted a firearms trafficking investigation that circumvented the Virginia one handgun per month law.  Garfield Headlam was enlisted in the Navy and stationed in Norfolk, Virginia.  However, Headlam had ties to a criminal gang operating in Washington, D.C.  Headlam recruited the support of numerous straw purchasers to each buy him one handgun per month that he subsequently provided to criminals in Washington, D.C.  The investigation uncovered 57 illegally acquired firearms.   As the case agent, I was leading a surveillance of Headlam in Virginia and witnessed him purchase one handgun and one semi-automatic rifle, destined for Washington, D.C.  As previously mentioned, the Virginia law at the time only prevented the multiple purchase of handguns within a 30-day period.    As    reported    by    the    Virginian-Pilot    (March    4,    2008, https://www.pilotonline.com/government/nation/article_e9f0e3d2-5bc4-5a0d-90dd-a1e3cd6c2b51.html), Headlam admitted the Virginia one-gun-a-month law hampered his ability

to traffic firearms as it necessitated him recruiting numerous straw purchases. As stated by Headlam, "I'm proof the law works".

13.     I have reviewed numerous publications and reports supporting the belief that multiple purchases are a strong firearms trafficking indicator. According to Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use, Christopher S. Kopek, Journal of Quantitative Criminology, Volume 30, Number 2, June 2014, multiple sales "appear to account for roughly a quarter of guns used in crime and a number of studies provide indirect indications that guns sold in these transactions are more likely to be trafficked and used in crime." According to Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms, Douglas Weil and Rebecca Knox, JAMA, June 12, 1996, Vol. 275, No. 22, "restricting purchases of handguns to 1 per month is an effective way to disrupt the illegal movement of guns across state lines." Finally, "ATF has identified multiple sales or purchases of firearms by a nonlicensee as a 'significant indicator' of firearms trafficking", Government Accountability Office Report, Firearms Trafficking, U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges, June 2009.

14.     I have also read analysis evaluating the effectiveness of Virginia's one gun per month law substantiating that the law reduced the number of illegal firearms sourced from the State. According to the Report of the Virginia State Crime Commission Study of Virginia's Law on Handgun Purchase Limits, House Document No. 28, 1996, "Virginia's one-gun-a-month statute…has had its intended effect of reducing Virginia's status as a source state for gun trafficking."

15.     I have personally created training programs and trained well over one thousand law enforcement officers on firearms trafficking investigations. These trainings have covered all aspects from pre-planning, to investigative analysis, to investigative tactics. A large component of the trainings dealt with identifying suspected trafficking operations. All of the trainings I have developed and delivered instructed investigators to utilize multiple sales as a way to identify firearms trafficking operations and/or further firearms trafficking investigations.

16.    The mere fact the federal agency tasked with reducing the criminal misuse of firearms requires notification of multiple purchases reinforces the connection between multiple purchases and illegal firearms activity.  Even more telling is the fact that the multiple purchase database maintained by ATF is the only legally allowed federal database associating firearms to an individual purchaser.

17.    It is my understanding the Connecticut law in question does not preclude individuals from acquiring firearms, but merely limits the number they can purchase within a specified time period.  The law also does not limit the overall number of firearms an individual can possess.

18.    As documented, my training and experience leave no doubt that firearms traffickers utilize multiple sales to procure quantities of firearms for illegal use.  Limiting the supply of firearms reduces the profit motive and decreases the chances of illegal trafficking.  While notifying law enforcement of a multiple sale is beneficial, the fact remains that the firearms are already distributed to the purchaser.  Notifying law enforcement after the fact does not prevent at least some of these firearms from being used in crimes.  In my opinion, the Connecticut restriction on multiple sales of firearms maintains individuals' ability to acquire firearms while reducing the incidence of illegal trafficking.  As convicted gun trafficker Garfield Headlam told me, he "wanted to be a big-time trafficker", but the Virginia restriction on multiple sales made it hard for him.

19.    I am being compensated for my time in this matter at my normal billing rate, currently $150 per hour ($250 per hour for depositions and trial testimony.)  This compensation is not contingent upon the nature of my findings or on the outcome of this litigation.

20.    I have also served as an expert in *LaManno v. WalMart*, Circuit Court of Jackson County, Missouri, Case Number 1616-CV08764, in *City of Kansas City, Missouri v. Jimenez Arms*, Circuit Court of Jackson County, Missouri, Case Number 2016-CV00829, in *Madden vs. P&S Security,* District Court of Rice County, Kansas, 2021-CV-000011, in *State of California vs. Polymer 80*, Los Angeles County Superior Court, 21STCV06257, and in *Minnesota vs. Fleet*

*Farm*, United States District Court, District of Minnesota, 0:22-cv-02694-JRT-JFD.   I was deposed in all of these cases.

I declare under penalty of perjury on this 25th day of March 2025, that the foregoing is true and correct.

Joseph Bisbee